**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHER DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **YOLANDA CARRASCO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 12 C 0483** |
| **v.** | ) | |
| | ) | **Magistrate Judge Jeffrey Cole** |
| **MICHAEL J. ASTRUE, Commissioner** | ) | |
| **of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Yolanda Carrasco, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying her application for Disability Insurance Benefits ("DIB") under Title II, Sections 216(i) and 223(d) of the Social Security Act ("Act"), and for Supplemental Security Income ("SSI") under Title XVI, Section 1614(a)(3)(A) of the Act. Ms. Carrasco asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## I.
## PROCEDURAL HISTORY

Ms. Carrasco filed concurrent applications for DIB and SSI on December 3, 2008, alleging she had been disabled since November 15, 2008, due to severe impairments of ligament tear and mild degenerative osteoarthritis right knee; mild degenerative change, left shoulder; degenerative disc disease with radiculopathy, cervical spine; chronic lower back pain; and obesity. (Tr. 15). In addition to these impairments, the plaintiff's record presents that she is seeking treatment for a fracture of the right ring finger, abdominal pain, diabetes mellitus type 1, depression, and hypertension. Both of her claims were initially denied on March 3, 2009, and upon reconsideration

on June 16, 2009. (Tr. 13). Thereafter, Ms. Carrasco filed a written request for hearing on August 11, 2009 (20 CFR §§ 404.929 *et seq.* and 416.1429 *et seq.*). The Administrative Law Judge (ALJ) convened a hearing held on July 13, 2010, at which Ms. Carrasco, represented by counsel, appeared and testified. (Tr. 29–51). In addition, Ms. Amy Mowery testified as a vocational expert. (Tr. 47–51). On October 19, 2010, the ALJ issued a decision, denying Ms. Carrasco's application for DIB and SSI. (Tr. 13–24). The ALJ found that Ms. Carrasco was not under a "disability" within the meaning of the Social Security Act, at any time through the date of the decision, because she has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) with limitations, of which there exist a significant number of jobs in the national economy, including her past relevant work as a telemarketer. (Tr. 13–24). This became the final decision of the Commissioner when the Appeals Council denied Ms. Carrasco's request for review on December 16, 2011. (Tr. 1–4).

Plaintiff seeks judicial review of the Commissioner's denial of her claims. The federal district court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c). Both parties consented in writing to proceed before a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.
## THE EVIDENCE OF RECORD

### A.
### The Vocational Evidence

Ms. Carrasco was born on April 3, 1963, making her forty-seven years old at the time of the ALJ's decision. (Tr. 23). She is single, and has one child who is seventeen years old. (Tr. 33). She lives in a house with her child and sister. (Tr. 33). She is 5' 2" tall and weighs 225-pounds. (Tr. 33). The plaintiff has a high school education and her past relevant work was a telemarketer. (Tr. 22).

She also received, but did not complete, specialized training as a certified nurse's assistant. (Tr. 33). Ms. Carrasco explained that she lost her job as telemarketer on November 15, 2008 because she "[was not] producing." (Tr. 34). At the time of her hearing, Ms. Carrasco was not employed.

## B.
## The Medical Evidence

In her nine-page memorandum in support of her motion for summary judgment, Ms. Carrasco bases her claim that she is entitled to DIB on her inability to use her left dominant upper extremity, cervical pain, and pain and numbness in her left hand, left arm, left shoulder, and neck. She cites to various pieces of medical evidence to support her position: diagnostic test results including MRI reports of her right knee, cervical spine and left shoulder, an EMG examination, X-ray examination results, and reports from several physicians who treated her. She contends that this evidence proves that the ALJ erred when he failed to find that she was disabled.

On August 31, 2007, Ms. Carrasco visited Dr. Pervez Rasul and was diagnosed with diabetes mellitus. (Tr. 294). In the ophthalmological report, Dr. Rasul reported that Ms. Carrasco's function or employability would be markedly improved by treatment or appliance, and specified that she needed reading glasses. (Tr. 296). In addition, Dr. Rasul reported that Ms. Carrasco has the ability to ambulate safely, drive safely, perform activities that require good eye/hand coordination, and perform activities that require good distant, detailed vision. (Tr. 297).

On February 8, 2008, Ms. Carrasco visited Berwyn Magnetic Resonance Center and had her right knee examined by Dr. Joyce Tarbet. Dr. Tarbet reported that there is intrinsic degenerative signal within the anterior horn of the medial meniscus, but that no definite tear is identified. (Tr. 414). Moreover, Dr. Tarbet's report noted that there is absence of a normal appearing cruciate

ligament and tricompartmental arthritic changes. (Tr. 414). Dr. Tarbet reported that no full-thickness cartilaginous defects nor bone contusions are identified. (Tr. 414).

On October 28, 2008, Ms. Carrasco went to see Dr. Manish Desai for a flu visit. Dr. Desai found that Ms. Carrasco was experiencing level 10/10 pain in her right knee and level 5/10 pain in her back. (Tr. 283). Dr. Desai also noted that Ms. Carrasco's eyes were worsening and that she had blurriness of vision. (Tr. 283).

In December of 2008, Dr. Tarbet indicated to Dr. Desai that Ms. Carrasco has early degenerative arthritis of her right knee. (Tr. 403).

On February 13, 2009, Ms. Carrasco visited a State agency physician who conducted an X-ray examination on her right knee and lumbar spine. (Tr. 312). Dr. Eugene Kovalsky's X-ray interpretation noted that there is no evidence of fracture in the right knee. (Tr. 313). Dr. Kovalsky reported that a slight degree of narrowing at the medial joint compartment with mild sclerosis at the articulating surfaces can be noted and concluded that Ms. Carrasco had mild degenerative arthritis. (Tr. 313). Dr. Kovalsky stated that the study of Ms. Carrasco's right knee was otherwise normal. (Tr. 313). In interpreting the lumbosacral spine examination, Dr. Kovalsky reported that the study shows normal vertebral bodies in correct alignment; the intervertebral spaces are well maintained with well defined articulating surfaces; and the posterior spinal elements and facet joints are normal. (Tr. 313).

On the same date, Dr. James A. Runke performed the Internal Medicine Consultative Examination for the Bureau of Disability Determination Services after obtaining and reviewing Ms. Carrasco's medical records and history. Results from this physical examination revealed that Ms. Carrasco has evidence of hyper-lordosis of the lumbar spine and associated tenderness to palpation

with bilateral paravertebral muscle spasm in the lower lumbar spine region. (Tr. 317). Moreover, Dr. Runke noted that Ms. Carrasco has tenderness over the medial and lateral joint lies of both knees. (Tr. 317). Dr. Runke added that there is decreased range of motion with pain at the lumbar spine and both knees, and that significant palpable crepitations are appreciated with active and passive range of motion at both knees, more severe on the right than on the left. (Tr. 318). Dr. Runke noted four problems in the clinical impression section of his report: obesity, knee and back arthralgias consistent with degenerative joint disease, diabetes mellitus, and hypertension. (Tr. 319). Additionally, Dr. Runke reported that Ms. Carrasco was observed ambulating "slowly and gingerly with each lower extremity taking very, very small steps with each forward movement." (Tr. 317-318).

Dr. Virgilio Pilapil completed a residual functional capacity ("RFC") form on March 2, 2009. Dr. Pilapil opined that Ms. Carrasco could only occasionally lift 20 pounds, stand or walk for a total of at least two hours and sit for a total of about 6 hours in an eight hour work day. (Tr. 328). Dr. Pilapil also noted that Ms. Carrasco was limited in pushing and pulling in her lower extremities. (Tr. 328).

A CT examination of Ms. Carrasco's abdomen and pelvis dated March 6, 2009 revealed that a thickening of part of the right minor fissure, but no acute abnormality of the lung bases. (Tr. 392). Dr. David Moon reported here that there is no hydronephrosis. (Tr. 392).

On May 6, 2009, Ms. Carrasco had her cervical spine and left shoulder examined. The cervical spine MRI indicates C5-6 left paracentral disc-osteophyte protrusion which severely narrows the left paracentral region of the spinal canal (Tr. 354). The report also adds that degenerative changes of the remainder of the cervical spine are mild. (Tr. 356). The left shoulder

MRI notes that there are mild degenerative changes of the acromioclavicular joint, and also noted a 1.6 x 1.6 cm left axillary lymph node. (Tr. 356).

Ms. Carrasco also had her left elbow examined on June 6, 2009. The result of the MRI noted that there was no grossly abnormal mass of the left elbow. (Tr. 410).

An EMG report by Dr. Tarbet dated August 6, 2009 reveals left C6 radiculopathy with acute and subacute denervation changes. (Tr. 395). Moreover, Doctor Tarbet commented that the EMG changes correspond to the duration of Ms. Carrasco's symptoms. (Tr. 395).

### C.
### The Administrative Hearing Testimony

### 1.
### Ms. Carrasco's Testimony

At her hearing, Ms. Carrasco testified that she suffered from pain in her back, right leg, left shoulder, and left hand. (Tr. 35). Because she was experiencing so much pain in her back and leg, she tried to receive therapy and treatment, but she stated that there was nothing that could be done because her pain was "so severe." (Tr. 35). She also added that no surgery has been suggested for her back. (Tr. 36). She said that she takes pain medicine because of much pain in her joints, and she stated that she did not experience any side effects from her medication. (Tr. 35). She also added that she has received injections and nerve blocks to ease the pain, but they did not help. (Tr. 35). Ms. Carrasco said she will be having surgery on her left shoulder shortly due to a diagnosis that there could be a tumor by her left elbow. (Tr. 35). Ms. Carrasco also stated that she has diabetes, and she treats it by taking Insulin and some pills. (Tr. 36). She also has cholesterol and takes medication for hypertension. (Tr. 36).

When asked how far she can walk, Ms. Carrasco testified that she can walk about a block, and she stated that the reason she would stop after a block is that her knee and back would hurt. (Tr. 36). She also testified that she can stand on her feet for about 45 minutes, and can sit for about "a good 30 minutes." (Tr. 36). When asked why she would get up after 30 minutes, she answered that her back and her knees would start hurting. (Tr. 36). Ms. Carrasco also stated that she cannot lift more than 10 pounds. (Tr. 36). She also testified that she has difficulty climbing stairs, but there are no stairs at her home. (Tr. 37). When asked if she has difficulty bending, stooping, crouching, and crawling, Ms. Carrasco answered affirmatively. (Tr. 37). She also stated that she has problems with balance, specifically on her right knee. (Tr. 37). She therefore uses a cane or assistive device sometimes, depending on where she is going. (Tr. 37). For example, she stated that she uses her cane for her doctor's appointments. (Tr. 37). Ms. Carrasco also testified that she has difficulty reaching overhead and reaching in front with her left shoulder. (Tr. 37-38). She has no problems using her right hand, but she feels pain and numbness in her left hand. (Tr. 38). She stated that the doctor does not think that her pain and numbness in her left hand is due to the tumor. (Tr. 38). Rather, she testified that the doctor said the pain and numbness in the left hand is from the radiculopathy. (Tr. 38).

When asked how her sleep is at night, Ms. Carrasco answered that she does not sleep at night. (Tr. 38). She normally takes sleeping pills or medication to kill her pain and which puts her to sleep. (Tr. 38). Ms. Carrasco testified that she sleeps for about three to four hours during the day. (Tr. 38). She also stated that she has some difficulty with taking a shower as she is only able to use her right hand. (Tr. 39). She stated that she has no difficulty preparing a meal such as using a microwave or making herself a sandwich. (Tr. 39). However, she testified that she "really [doesn't]

do anything at home," when she was asked if she is able to do dishes, wash, dry, load, and unload. (Tr. 39). She testified that her sister does laundry, and she is unable to do laundry because of her back which "gets dislocated from the hip." (Tr. 39).

When asked how many times a week she leaves the residence, Ms. Carrasco answered that she goes out about twice a week. (Tr. 41). She testified that she goes to the grocery store with her sister once in a while. (Tr. 39). When asked if she goes outside and sits in the yard and whether she is able to do any planting or activities as such, she answered in the negative. (Tr. 40). She also testified that rather than her visiting with family and friends, they come over to her house instead. (Tr. 40). Moreover, she testified that she used to attend a church but stopped going "a lot of years back." (Tr. 40). Ms. Carrasco also stated that she does not go out to eat, to concerts, ball games, movies, to events for her son. (Tr. 40). She also testified that she does not do any reading because her eyes are blurry. (Tr. 40). She stated that she has seen the eye doctor, and the doctor told her to wear glasses. (Tr. 40). She testified that she watches television once in a while, and that she particularly enjoys the show Judge Mack. (Tr. 41). Although there is a computer at her home, Ms. Carrasco testified that she does not use it at all and only her sister uses it. (Tr. 41). She has no special hobbies. (Tr. 41). Ms. Carrasco said that she used to drive in the past, but when she lost her job, she could not drive anymore because of pain in her back, knee, and neck, and her inability to turn her head side to side. (Tr. 39, 43).

Ms. Carrasco also testified that she has been feeling very depressed ever since she lost her job because she was there for seven years. (Tr. 42). She said that she was in the hospital recently, on April 7, 2010, in McNeil. (Tr. 44). She testified that her chest pains and numbness to her left arm caused her to be admitted at that time. (Tr. 45). She also added that she complained to the doctor

about depression. (Tr. 45). When asked why she wasn't seeing a therapist, Ms. Carrasco answered that it was because her doctor had not recommended one to her. (Tr. 45). Ms. Carrasco also testified that she has been taking six medications, but is now taking additional medication, including Trilipix, Tramadol for pain, and Metformin and Lantus for diabetes. (Tr. 45). Additionally, she is taking Diclofenac Sodium and Cyclobensaprine or Flexeril, which cause her to sleep about three to four hours during the day. (Tr. 45). Altogether, Ms. Carrasco is taking at least over 11 medications. (Tr. 45). When asked if she had been taking any medications while she was working as a telemarketer, she answered in the negative. She also stated that she has not gotten better since she stopped working. (Tr. 45-46).

When asked what would stop her from physically returning to her job as a telemarketer that she was fired from, Ms. Carrasco answered that the pain in her back would stop her. (Tr. 42). Moreover, she noticed that her legs get numb and her knees get swollen. (Tr. 42, 44). She also testified that in her job as a telemarketer, she had to sit all the time. (Tr. 42). Ms. Carrasco said that when she sits, after 30 or 45 minutes, she constantly has to turn side to side and stand for about "a good 30 minutes" and get up and walk around before sitting back down. (Tr. 44). She said she has to do this because of her back and her knees. (Tr. 44). She also testified that the pain in her back and her neck bothered her when she worked as a telemarketer. (Tr. 43). She added that the problem in her neck affected her hands as it causes her left arm to have pain and pain in her neck numbs the whole finger, from the finger up. (Tr. 43). When asked if the doctors ever talked to her about surgery in her neck or left shoulder, Ms. Carrasco answered in the negative. (Tr. 43-44). Ms. Carrasco testified that she has done everything that her doctor, Dr. Desai, has asked her to do, and that she

has not refused any treatment. (Tr. 46). She also stated that she cannot bend her neck forward because her neck and left arm would start hurting. (Tr. 46-47).

Ms. Carrasco also testified to the ALJ that she is receiving assistance from the state through a LINK card, and that she is no longer receiving unemployment, which stopped last month. (Tr. 34). Moreover, she testified that she has been looking for a job via the Internet with the help of her sister. (Tr. 34). She stated that she has been looking for office work. (Tr. 34, 46). However, she testified that if someone had actually offered her a job as an office worker, she does not think that she would have been able to do it because of her back and her legs. (Tr. 46).

## 2.
## The Vocational Expert's Testimony

Ms. Mowery then testified as a vocational expert ("VE"). In response to the ALJ's hypothetical, she testified that a person who is the same age as Ms. Carrasco, has the work experience and education of Ms. Carrasco, could lift and carry ten pounds occasionally and frequently, could stand and or walk a total of two hours and sit at least six hours during an eight hour work day with a sit stand option, meaning that after one hour of sitting they're allowed to stand one to two minutes, and who should never climb ladders, ropes, or scaffolding, but who could occasionally climb ramps and stairs and balance, stoop crouch, crawl, push, and reach overhead with the left upper extremity, would be able to perform her past relevant work as a telemarketer. (Tr. 48).

Moreover, Ms. Mowery testified that there are several other unskilled occupations Ms. Carrasco would be able to perform. (Tr. 48). The first would be an information clerk with an SVP: 2, an exertional level of sedentary. (Tr. 48). There were 2,931 such jobs in the region. (Tr. 48). The second position would be an interview clerk with an SVP: 2, an exertional level of sedentary. (Tr. 49). There were 741 such positions in the region. (Tr. 49). The third occupation would be an order

clerk with an SVP: 2, an exertional level of sedentary. (Tr. 49). There were 718 such positions in the region. (Tr. 49). The ALJ then asked the VE if those jobs would exist if the hypothetical person would be off task at least 20 percent of the work day. (Tr. 49). Ms. Mowery replied that there would not be any occupations at a sedentary level that would match that. (Tr. 49).

Ms. Carrasco's attorney then asked Ms. Mowery if taking about a three hour break during an eight hour work day, which would actually be more than a 20 percent of the work day, would prevent an individual's ability to sustain work, which Ms. Mowery answered in the affirmative. (Tr. 49). Ms. Carrasco's attorney also asked if these jobs that the VE identified are sedentary jobs. Ms. Mowery responded that they were all sedentary jobs that required an individual to sit at least two hours out of an eight hour work day. (Tr. 50).

Next, when Ms. Carrasco's attorney asked if the jobs that Ms. Mowery identified required an individual to have unlimited use of the neck without any restrictions, Ms. Mowery answered that work stations could be set up to ergonomically to fit the limited mobility in her neck for all of those occupations. (Tr. 50). When asked if that would require some kind of accommodation, the VE responded in the negative, since technically it would just be an adjustment of the monitor or the keyboard, which is normal according to Ms. Mowery as she stated that "any employer does that for any employee." (Tr. 50).

## D.
### The Administrative Law Judge's Decision

The ALJ followed a five-step sequential process in determining whether Ms. Carrasco was disabled. In step one, the ALJ found that Ms. Carrasco met the insured status requirements of the Social Security Act through December 31, 2012. (Tr. 15). Second, the ALJ found that Ms. Carrasco had not engaged in substantial gainful activity since November 15, 2008, the alleged onset date. (Tr.

11

15). Third, the ALJ found that Ms. Carrasco had the following severe impairments: ligament tear and mild degenerative osteoarthritis, right knee; mild degenerative change, left shoulder; degenerative disc disease with radiculopathy, cervical spine; chronic lower back pain; and obesity. (Tr. 15). In addition to these impairments, the ALJ also noted that the record presents that Ms. Carrasco was seeking treatment for a fracture of the right ring finger, abdominal pain, diabetes mellitus type 1, depression, and hypertension. (Tr. 15). However, after considering the medical evidence available, the ALJ determined that these impairments were not severe. (Tr. 15).

Next, the ALJ considered the available medical evidence for each of Ms. Carrasco's severe impairments and concluded that Ms. Carrasco did not have an impairment or a combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). (Tr. 17).

In regards to the plaintiff's residual functional capacity, the ALJ found that Ms. Carrasco had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) with limitations. (Tr. 19). The ALJ determined that Ms. Carrasco had the following residual functional capacity: lift no more than a maximum of 10 pounds at a time; occasionally lift and/or carry articles like docket files, ledgers, and small tools, can stand/walk for a total of no more than two hours in a normal eight-hour workday and sit for a total of six hours in a normal eight-hour workday with an option to stand for one to two minutes after sitting for one hour, can push and/or pull to include operation of hand and/or foot controls as restricted by the limitations on carrying/lifting with only occasional use of the left upper extremity subject to postural limitations of never climbing ladders, ropes or scaffolds, occasionally climbing ramps or stairs, occasionally

balancing, stooping, crouching, kneeling, or crawling; a manipulative limitation of occasionally reaching overhead with the left upper extremity; and an environmental limitation of avoiding concentrated exposure to work hazards (machinery, heights, etc.). (Tr. 19-20).

At the next step, the ALJ determined that Ms. Carrasco was capable of performing her past relevant work as a telemarketer. The ALJ noted that this work did not require the performance of work-related activities precluded by Ms. Carrasco's residual functional capacity. (Tr. 22). In making this determination, the ALJ considered the vocational expert's testimony that the plaintiff could still perform the job of telemarketer as it is usually performed and as the plaintiff performed it. (Tr. 23). Moreover, the ALJ found that, based on Ms. Carrasco's age, education, work experience, and residual functional capacity, there were other jobs that exist in significant numbers in the national economy that Ms. Carrasco can perform. (Tr. 24). Therefore, the ALJ decided that Ms. Carrasco had not been under a disability, as defined in the Social Security Act, from November 15, 2008, through the date of the decision. (Tr. 24).

### III.
### DISCUSSION

### A.
### The Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). The court reviews the ALJ's decision directly, but does so with deference, *Weatherbee v. Astrue*, 649 F.3d 565, 568–569 (7th Cir.2011), and with a limited role of not making independent credibility determinations or reconsidering the facts and evidence. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir.2000); *Simila v. Astrue*, 573 F.3d 503, 513–514; *Elder*, 529 F.3d at 413. The court does "not

13

actually review whether [the claimant] is disabled, but whether the Secretary's finding of not disabled is supported by substantial evidence." *Lee v. Sullivan*, 988 F.2d 789, 792 (7th Cir.1993). Substantial evidence is "more than a mere scintilla" and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). If the court finds that the ALJ's decision is supported by substantial evidence, then the court must affirm the decision, even if reasonable minds may differ as to whether the plaintiff is disabled. 42 U.S.C. § 405(g); *Books v. Chater*, 91 F.3d 972, 978 (7th Cir.1996). However, since conclusions of law are not entitled to such deference, if the Commissioner committed an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir.2007).

While the standard of review is deferential, the court cannot "rubber stamp" the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir.2002). Although the ALJ need not address every piece of evidence, the ALJ cannot subjectively limit his discussion to only the evidence that which supports his ultimate conclusion. *Herron*, 19 F.3d at 333. The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir.2009). The Seventh Circuit refers to this process as building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet*, 78 F.3d at 307. It is a "lax" standard. *Berger*, 516 F.3d at 545. It is enough if the ALJ " 'minimally articulate[s] his or her justification for rejecting or accepting specific evidence of disability.' " *Berger*, 516 F.3d at 545; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir.2001).

14

## B.
## The Five-Step Sequential Analysis

To qualify for disability benefits, a claimant must be "disabled," which is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which … has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Stanley v. Astrue*, 410 Fed. Appx. 974, 976 (7th Cir. 2011); *Liskowitz v. Astrue*, 559 F.3d 736, 739–740 (7th Cir.2009). The claimant must also show that the disability arose while he or she was insured for benefits. *See* 42 U.S.C. §§ 423(a)(1)(A), (c)(1); *Sienkiewicz v. Barnhart*, 409 F.3d 798, 802 (7th Cir.2005).

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) Is the plaintiff currently unemployed;

2) Does the plaintiff have a severe impairment;

3) Does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) Is the plaintiff unable to perform his past relevant work; and

5) Is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila*, 573 F.3d at 512–513; *Briscoe ex rel. Taylor*, 425 F.3d at 351–352. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. 20 C.F.R. §§ 416.920; *Briscoe ex rel. Taylor*, 425 F.3d at 352; *Stein*, 892 F.2d at 44. A negative answer at any point, other than at step three, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. § 404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four, and if it is met, then the burden shifts to the

Commissioner at step five. *Briscoe ex rel. Taylor*, 425 F.3d at 352; *Brewer v. Chater*, 103 F.3d 1384, 1391 (7th Cir. 1997).

**C.**
**Analysis**

**1.**
**Ms. Carrasco's Objections to the ALJ's Decision**

Ms. Carrasco first questions the sufficiency of the Residual Functional Capacity Assessment as a matter of law, alleging that the ALJ failed to explain how he arrived at the RFC, and that he failed to take into account the medical evidence in the record that demonstrates Ms. Carrasco's physical limitations in his RFC assessment. (Pl.'s Mem. at 3-7). Specifically, Ms. Carrasco argues that the ALJ's findings are not supported by substantial evidence with regard to Ms. Carrasco's left knee and upper extremity functional limitations. Ms. Carrasco contends that the ALJ failed to include in his RFC assessment that Ms. Carrasco is left hand dominant and that her limitations in her left hand, arm, and shoulder would consequently impact her work capabilities. (Pl.'s Mem. at 6-7).

Second, Ms. Carrasco objects on the grounds that the ALJ did not adhere to the guidelines set forth in SSR 02-01p. She argues that the ALJ failed to make a proper determination of her obesity and whether it caused any physical limitations in terms of sitting, standing, walking, and manipulating. (Pl.'s Mem. at 7-8). In particular, Ms. Carrasco contends that the ALJ erred in not considering the impact of her obesity on her right knee and left dominant upper extremity. (Pl.'s Mem. at 8-9).

**2.**
**Sufficiency of the Residual Functional Capacity Assessment**

In between the fourth and fifth steps of the ALJ's sequential process, the ALJ must consider an assessment of the plaintiff's residual functional capacity (RFC), which is an assessment of what work-related activities the plaintiff can perform despite her limitations. *Dixon*, 270 F.3d at 1178; *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir.2004). The residual functional capacity assessment is the "most [the plaintiff] can do despite [her] limitations." 20 C.F.R. Sec. 404.1546(a)(1). In constructing the claimant's RFC, the ALJ must consider all impairments, even if each, taken individually, is not severe. SSR 96-8p. In reviewing the ALJ's decision, a court cannot reweigh evidence, resolve conflicts in the record, decide questions of credibility, or substitute his own judgment for that of the ALJ. *Young*, 362 F.3d at 1001; *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir.2003); *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir.2003). Rather, the court's task is to determine whether the ALJ's factual findings are supported by substantial evidence. 42 U.S.C. § 405(g); *Jens*, 347 F.3d at 212; *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir.1997). The RFC assessment must include a "discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." SSR 96-8p.

### a.
### The ALJ's RFC Assessment Was Proper

Ms. Carrasco argues that the ALJ improperly evaluated her RFC under SSR 96-8p. Specifically, Ms. Carrasco claims that the ALJ failed to take into consideration her inability to sit for a total of six hours of an eight hour workday, which she had testified during the hearing and which she claims is thoroughly demonstrated in her medical record, in her RFC assessment. During the hearing, Ms. Carrasco testified that after sitting for thirty minutes, she would have to stand and walk around thirty minutes before trying to sit down again. (Tr. 44). But, these were simply her

17

allegations, and substantial evidence supports the ALJ's RFC finding that Ms. Carrasco could perform a reduced range of sedentary work. (Tr. 19-20). When the ALJ formulates a RFC, he is not forced to bring in limitations a plaintiff alleges that are not documented by medical evidence; the limitations in his RFC formulation need only follow the limitations documented by the medical evidence. *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2008)(ALJ need not include alleged limitations in the RFC that conflict with the medical record).

Ms. Carrasco, however, argues that her inability to sit for a total of six hours of an eight hour workday is clearly demonstrated in her medical record, and because a vocational expert testified during the hearing that sedentary work requires an individual to sit six hours in an eight hour day and that there would be no work for an individual off task more than twenty percent of the day, she is unable to perform not only her past relevant work as a telemarketer but also any other work in the national economy. She therefore argues that the ALJ erred in failing to take into consideration the medical evidence demonstrating her limitations in the RFC determination.

She contends that her disability is demonstrated in the record containing her MRI examination results dated February 8, 2008 of the right knee which reveal a full-thickness tear; absence of a normal appearing cruciate ligament and tricompartmental arthritic changes. (Tr. 414). In addition, she contends that the results from her physical examination by Doctor Runke revealed a decreased range of motion in her lumbar spine and knees. (Tr. 317-323).

However, none of these medical documents prove that Ms. Carrasco is unable to sit for a total of six hours of an eight hour workday. Furthermore, none of Ms. Carrasco's treating physicians opined that Ms. Carrasco's impairments were disabling. (Tr. 21). For example, Dr. Runke offered no opinion on Ms. Carrasco's functional limitations, and most importantly, the state agency

18

reviewing physician who reviewed Dr. Runke's consultative examination report found that Ms. Carrasco could sit for six hours. (Tr. 328). Therefore, the ALJ's RFC assessment was supported by substantial evidence.

**b.**
**The ALJ Properly Considered Ms. Carrasco's Subjective Allegations**

In addition to taking into consideration the medical evidence and treating physicians' opinions, the ALJ also properly considered Ms. Carrasco's subjective allegations during the hearing in making the RFC assessment. For example, the ALJ took note of Ms. Carrasco's allegation that although she had experienced pain in her back and knee, she was able to and did continue to work before she was fired . (Tr. 21, 43). She was terminated from her past relevant work as a telemarketer not because of her medical impairments, but because her supervisor concluded that she was not producing. (Tr. 21, 34). Moreover, after she was terminated from her job in November 2008, Ms. Carrasco received unemployment benefits, which ended in June 2010. (Tr. 22, 34). The ALJ noted that the fact that Ms. Carrasco was receiving unemployment benefits supports the conclusion that she was ready, willing, and able to work. (Tr. 22). This was an appropriate consideration. *Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005). In fact, during the hearing, Ms. Carrasco even admitted that she was actively looking for work, specifically office work. (Tr. 34). The ALJ therefore concluded that the fact that Ms. Carrasco collected unemployment benefits supports the inference that she has not been truthful to either the State or the Social Security Administration about her disability. (Tr. 22).

The ALJ also considered Ms. Carrasco's alleged subjective complaint about her neck and knee pain by taking note of Ms. Carrasco's treating orthopedic specialist's examination results. The ALJ noted that the physician had never recommended more than conservative care for Ms.

Carrasco's neck and knee pain. (Tr. 21). Thus, in assessing Ms. Carrasco's RFC, the ALJ properly considered Ms. Carrasco's subjective allegations; he simply did not credit them.

### 3.
### The Analysis of Obesity

Ms. Carrasco contends that in addition, the ALJ failed to analyze the combined effects of her obesity with other impairments despite the ALJ's conclusion that Ms. Carrasco's extreme obesity is a severe impairment and SSR 02-01p therefore requires a determination of how her obesity affected her other impairments. (Pl.'s Mem. at 7). However, conditions must not be confused with disabilities. The social security disability benefits program is not concerned with health as such, but rather with ability to engage in full-time gainful employment. *Adams v. Astrue*, 880 F.Supp.2d 895, 913 (7th Cir.2012) (a person can be depressed, anxious, and obese yet still perform full-time work).

This point is obscured by the tendency in some cases – and in most briefs of social security claimants – to describe obesity as an impairment, limitation, or disability. *Sienkiewicz v. Barnhart*, 409 F.3d 798, 803 (7th Cir.2005) (per curiam). It is, however, as Judge Posner has pointed out, none of these things from the standpoint of the disability program. It can be the *cause* of a disability, but once its causal efficacy is determined, it drops out of the picture. If the claimant for social security disability benefits is so obese as to be unable to bend, the issue is the effect of that inability on the claimant's capacity for work. *Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir.2005).

### a.
### The ALJ Did Adhere to the Guidelines Set Forth in SSR 02-01p

Ms. Carrasco claims that the ALJ did not adhere to the guidelines set forth in SSR 02-01p, arguing that the ALJ's decision did not consider or analyze how Ms. Carrasco's obesity affects her right knee pain or left upper extremity condition. (Pl.'s Mem. at 7). However, Ms. Carrasco failed

to provide any evidence showing that her obesity affects her ability to use her right knee or left upper extremity. Although she has asserted during the hearing that her obesity affects her right knee, the ALJ limited Ms. Carrasco to sedentary work, and she failed to present evidence demonstrating that her obesity caused greater functional limitations than found by the ALJ. Ms. Carrasco's testimony that her obesity affects her right knee pain and left upper extremity condition need not be accepted as true. 20 C.F.R. § 404.1512 (c) provides that a claimant "must provide medical evidence showing that you have an impairment(s) and how severe it is during the time you say that you are disabled." No treating physician opined that Ms. Carrasco's obesity was such as to cause greater limitations than found by the ALJ. The ALJ did consider Ms. Carrasco's obesity and concluded it did not directly affect her ability to work.

**CONCLUSION**

The plaintiff's motion for summary judgment or remand is DENIED, and the Commissioner's motion is GRANTED.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** 8/26/13